**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **MARY BRADLEY, individually, and in a representative capacity for all persons Identified by RSMo. § 537.080, on behalf of decedent LAURA BRADLEY** Address: 9940 Norwich Dr. St. Louis, MO 63137 | **Case No.** **Division No.** **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| v. | |
| **BRIDGETON OPERATIONS LLC d/b/a LIFE CARE CENTER OF BRIDGETON** Serve Registered Agent: CSC-Lawyers Incorporating Service Company 221 Bolivar Street Jefferson City, MO 65101 **LIFE CARE CENTERS OF AMERICA, INC.** Serve R/A: CSC-Lawyers Incorporating Service Company, 221 Bolivar St., Jefferson City, MO 65101 | |
| Defendants. | |

## PLAINTIFF COMPLAINT FOR DAMAGES

The Plaintiff, by and through undersigned counsel, submits this Petition for Damages against

the above-named Defendants, and in further support, states and alleges as follows:

### PLAINTIFF

1.      Laura Bradley ("Resident") died on November 2, 2019, from an avoidable pressure

injury that she developed while a resident of the Missouri skilled nursing facility, Life Care Center

of Bridgeton ("Facility")

2.      Plaintiff Mary Bradley, is, and at all times relevant hereto, an individual over the

age of 21 and a resident of St. Louis, Missouri.

 *Filing of Steele Chaffee*

1

3.     Plaintiff Mary Bradley is a surviving child of Resident, and therefore, a member of the class of individuals authorized to pursue a wrongful death claim pursuant to RSMo § 537.080..

## DEFENDANTS

4.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

Bridgeton Operations LLC d/b/a Life Care Center of Bridgeton ("Facility")

5.     At all times relevant, Bridgeton Operations LLC d/b/a Life Care Center of Bridgeton ("Facility"), was a Missouri company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Life Care Center of Bridgeton ("Facility" or "the Facility") which is a Missouri licensed nursing home located at 12145 Bridgeton Sq Dr, Bridgeton, MO 63044.

6.     As such, Facility was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility

7.     Consequently, Facility, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

### Life Care Centers of America, Inc. ("LCCA")

8.     At all times relevant to this action, Defendant Life Care Centers of America, Inc., ("LCCA") was a Tennessee company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.



9.      At all times relevant, LCCA, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

10.     LCCA, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

      a.   Staffing budgets.

      b.   The development and implementation of nursing policies and procedures.

      c.   The hiring and firing of the administrator; and

      d.   Training and supervising nursing staff persons.

11.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

12.     LCCA is the alter ego of Facility.

13.     Consequently, LCCA owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

<strong>JURISDICTION AND VENUE</strong>

14.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

15.     Defendant Bridgeton Operations LLC's members are all Residents of states other than Missouri.

16.     LCCA's principal place of business is in Tennessee



17. Therefore, Plaintiff brings her claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

18. Pursuant to RSMo § 506.500.1(3), defendants. purposefully availed themselves of the protections and/or benefits of the laws in Missouri by committing tortious acts within the state including, but not limited to, failing to ensure that the Facility had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

19. A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Missouri, thereby making venue proper in this Court.

## AGENCY

20. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

21. The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

22. Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.



## FACTUAL BACKGROUND

23.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### Defendants' Treatment of Resident

24.     Upon information and belief, the Facility staff identified Resident as a fall risk and Resident required assistance with transfers.

25.     The records indicate that Resident was dependent in bed mobility, transfer and all ADLs by 3/27/18. In March 2019 the MDS indicated Resident required extensive assistance in bed mobility, Bladder and bowel incontinence.

26.     June to October ADL sheets indicate Resident's complete dependence in bed mobility.

27.     In addition, Resident had bladder and bowel incontinence.  Resident's Skin was intact per MDS on 6/27/19. 6/9/19 Braden score was score erroneously as indicated occasionally moist but MDS documented incontinence. Nonetheless, the score was 14 indicating moderate risk requiring care plan and implementation of preventive interventions to include T&P and heel protection. It should also be noted that the Braden score was 14 on 6/9/19 and 10 on 7/9/19. That Braden score indicates that Resident was bedfast with complete immobility. This indicates that between these dates there was rapid change in her functional condition that appears to have not been recognized or documented.



28.     Nonetheless, the significant reduction in the Braden score which on 7/9/19 indicated extremely high risk for development of pressure injuries, while on the same day there was documentation of no skin impairment, required immediate action to implement a low air loss mattress, aggressive turning and repositioning schedule, pressure offloading from the heel, and appropriate skin protection from moisture. It is not clear why the staff bothered to do a Braden score if they failed to take actions when the results indicated that Resident was at imminent and severe risk of developing pressure injuries.

29.     The care plan 3/8/19 revised 7/19/19 indicates low air loss mattress (LAL) but Vohra notes 7/12/19 and 7/19/19 indicate group 1 which is not an air loss mattress.

30.     Despite inability to move in bed, the care plan of 3/8/19 failed to provide for turning and repositioning (T&P) and the Section M1200 MDS dated 3/27/19 7/11/19 Turning and repositioning program was not checked. There was no heel and foot protection The was no barrier cream to protect the skin. Therefore, the care plan that was in effect prior to the development of multiple pressure injuries on or about 7/11/19 was deficient.



31.     Prior to the development of multiple pressure injuries on or about 7/11/19, there were multiple failures to provide preventive interventions: not clear if there was a low air loss mattress or when it was discontinued; no pressure redistribution device in wheelchair (during a period Resident was able to use a wheelchair); no consistent schedule of turning and repositioning at least every 2 hours in the bed (in June there were multiple days when Resident did not even receive bed mobility, indicating that Resident was unlikely to receive appropriate turning and repositioning, hygiene, incontinence care and skin care/protection; no consistent schedule of turning and repositioning at least every 1 hours in the wheelchair; no heel protection via heel elevation and protective boots; and no skin protection with barrier cream

32.     In fact, there was no documentation of any turning and repositioning, let alone a consistent schedule, at any time prior to the development of the pressure injuries/ulcers. The MDS dated 6/27/19 again indicated that there was no turning and repositioning program.

33.     The fact that a right hip pressure ulcer was discovered on 7/11/19 when it was already unstageable with slough and eschar also indicates that no one looked at the hip area for at least 24-48 hours, which again indicates that there was failure to provide skin protection with barrier cream and timely hygiene and incontinence care.

34.     The pressure ulcers developed as a result of consistent pressure applied on vulnerable area due to the failure to provide the above preventive interventions. The development of the pressure ulcers was avoidable because no preventive interventions were provided prior to their development.



35.     Resident developed pressure injuries on or about 7/11/19, but care plans were not prepared or revised until 7/16/19 and 7/19/19, and during this interval Resident developed additional pressure injuries. Not only was there failure to immediately develop a care plan, but the care plans were seriously deficient. The care plans developed on 7/16/19 and 7/19/19 provided only a "pressure reducing mattress." There was no plan for specific turning and repositioning to offload pressure from all the ulcers and other vulnerable area. There was no plan for protection of the ankles, heels and feet with boots. There was no plan to protect the hip and sacrum ulcer from moisture and fecal contamination.

36.     Vohra observed on 7/12/19 and 7/19/19 that there was group 1 bed and the new care plan indicated a "pressure reduction mattress" indicating that Resident was not on a low air loss mattress at that time. It is not known when Resident actually received a low air loss mattress (one was not documented until 10/7/19). However, the presence of pressure ulcers on the sacrum and both hips required the immediate provision of an air fluidized bed.

37.     The care plans failed to provide for offloading of pressure from all the ulcers, which due to the multiplicity of the ulcers required a specific plan using frequent repositioning in bed approximately every 15-20 minutes, use of pillows and wedges to prevent Resident from falling back into prior positions, and avoidance of placing her on the hips and the sacrum. At least one nurse realized that offloading is necessary, as it was documented on 7/19/19 that Facility called Resident's daughter and informed her that staff were "reeducated" to turn her from side to side.



38.     Turning from side to side is required in order to offload pressure from a sacrum pressure ulcer, but places more pressure on the hips, which also had pressure ulcers. That is why an air fluidized bed was absolutely essential for the treatment and care of Resident's pressure ulcers. None was ever provided to Resident.

39.     The only documentation in the record of any turning and repositioning was the one nurse note informing Resident's daughter that staff were "reeducated" to turn her from side to side.

40.     There was no documentation in the record that a consistent turning and repositioning with offloading of pressure from all pressure ulcers was ever provided to Resident until her last day.

41.     Section M1200 of the MDS dated 9/9/19 and 10/17/19 did not have documentation of a turning and repositioning program. Even just before Resident's death, there was a new deep tissue injury next to the necrotic pressure ulcer on the left hip.

42.     DTIs occur only due to pressure indicating that pressure was not offloaded from the left hip.

43.     Regardless of local treatments, without pressure offloading, pressure ulcers cannot heal and deteriorate.



44.     There was failure to document any interventions to protect the sacral and hip ulcers from moisture and fecal contamination, including a frequent diaper check and change program.

45.     There was no documentation in the record that even after the development of multiple ulcers on both heels, ankles and feet, any protection via elevation or boots was provided.

46.     The pressure ulcers deteriorated and became infected due to the failure to provide pressure offloading and protection from contamination.

47.     By 10/31/19 the right hip ulcer was infected and bone was visible, indicating that, more likely than not, it had osteomyelitis. the left hip and the sacrum pressure ulcers were also infected.

48.     On 10/18/19 a care plan indicated "Under the care of hospice for multiple wound and anorexia" Indeed, these were the main reasons Resident was on hospice. Since the development of the pressure ulcers, Resident lost 12 lbs, which was approximately. 12% of her body weight in 3 months. Anorexia and cachexia leading to weight loss occur when there is an inflammatory focus. Resident had several pressure ulcers that caused constant inflammation and led to her anorexia and weight loss.

49.     There was no other documented cause for Resident's weight loss.



50.     Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from Facility, LCCA, or any other staff member ever provide any sort of in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

51.     Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from Facility, LCCA or any other staff member ever implement the appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

52.     Upon information and belief, while Resident was a resident at the Facility, the Facility did not have an adequate number of staff working daily at the Facility to meet Resident's needs, perform the interventions required to prevent Resident's avoidable fall, or monitor and adequately supervise Resident's condition.

### Management of the Facility

53.     Most skilled nursing homes substantially derive their revenue and profits from the receipt of taxpayer dollars through the federally funded Medicare program.  Under Medicare, residents with higher acuity levels, i.e., a greater number and greater degree of illnesses, place higher demands for care and services on the facility and its staff.

 *Filing of Steele Chaffee*

11

54.     The rate at which the skilled nursing facilities accepting Medicare dollars for the delivery of nursing care and services, and according to the amount of their ultimate revenue and profits, are normally based upon the acuity level of the residents confided to their facilities.  Thus, the higher overall and/or average acuity a facility has, the higher their reimbursement rates will be in general.

55.     For purposes of reimbursement, acuity, the amount of care a resident requires, is measured using a process established by The Center for Medicare Services ("CMS").

56.     This process includes a detailed Resident Assessment Instrument, completed by the facility for each resident as varying intervals depending on the resident's circumstance.

57.     The RAI form is known as a "MDS" (Minimum Data Set) and must be certified to CMS by a registered nurse on behalf of the facility.

58.     The MDS information provided by the facilities for each resident is processed and CMS assigns a corresponding "RUG Score" which indicates a resident's acuity and reimbursement rate.

59.     Therefore, the amount of money a facility receives is based upon the amount of time the facility should spend caring for that resident, all based upon the assessment information the facility certifies as accurate to CMS.

60.     A completed MDS contains extensive information on a resident's nursing needs, activities of daily living impairments, cognitive status, behavioral problems, and medical diagnoses.  This information is used to slot the resident into a RUG.



61.     MDS's are required to be prepared for each resident of a skilled nursing facility when they initially arrive at the facility and periodically after that depending on the course of the resident's medical progression.  At a minimum, an MDS is to be prepared for every resident in a skilled nursing facility on a quarterly basis.

62.     The completion of an MDS by a skilled nursing facility is a part of the federally mandated process for clinical assessments of all residents in nursing facilities.  It is a core set of screening, clinical, and functional status elements reported on all residents of nursing facilities regardless of who is paying for the resident's stay in the nursing facility.

63.     MDS's need to be as detailed and comprehensive as possible so that they reflect all the needs of each of the residents in the nursing facility.

64.     When done properly, the MDS provides a comprehensive assessment of each resident's functional capabilities and helps nursing facility staff identify all the health problems of each of their residents.

65.     Each resident's RUG score is contained in section Z of their MDS evaluation, meaning the total care needs of the residents in any facility at a specific time is available by totaling the residents' RUG scores from their MDS evaluations.

66.     The RUG Score also determines the level of compensation a skilled nursing facility will receive to provide the level of care necessary for each of their residents.

67.     Residents in higher RUG categories place higher demands for care and services on the nursing facility and its staff.



68.     Providing care to residents in higher RUG categories is costlier and is, therefore, reimbursed at a higher level.

### Cost Reporting & Staffing Information

69.     Nursing facilities, like the Facility, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10". The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

70.     Included with the cost reports are extensive details as to how much money the nursing facility spent on RNs, LPNs, and CNAs. The cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

71.     By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident per day for the time covered by that cost report. This number is referred to as the "reported HPPD".

72.     CMS allows the facilities to include all paid hours in the "reported HPPD." Thus, that number does reflect true direct care hours, but is inflated because "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.

73.     The Facility was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.


*Filing of Steele Chaffee*

74.     To determine more accurate direct-care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employee's work.  This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data Reports", or some other similarly named report depending on the time-keeping system used by the nursing facility.

75.     The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility.  This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period including a year, a quarter, a month, or a day.

### Undercapitalization/Underfunding at the Facility

76.     LCCA, and Facility had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

77.      LCCA, and Facility had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

78.     Upon information and belief, Facility had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.



79.     Upon information and belief, no individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

80.     Transactions directed by LCCA and left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

## LEGAL BASIS FOR LCCA's LIABILITY

81.     LCCA directed, operated, and managed the day-to-day functions of their nursing facilities – including the Facility – by developing and implementing policies, practices and procedures affecting all facets of the Facility, including resident care.

82.     These policies manipulate and control the physical and financial resources and prohibit decision making at the Facility level.

83.     This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

84.     These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of the Facility's residents.

85.     LCCA affirmatively chose and decided to establish such operations and demand they be implemented.


Filing of
Steele Chaffee

16

86.     Upon information and belief, such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the facility's staff.

87.     LCCA consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

88.     LCCA, conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

    a.   The shared interest in the operation and management of nursing facilities.

    b.   The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

    c.   The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing nursing facilities.

89.     LCCA share a common interest in the operation and management of nursing facilities, including the Facility; maintain agreements to share in the profits or losses of the operation of nursing facilities described herein; and operate daily evincing conduct which indicates their cooperation in the venture of operating and managing nursing facilities for profit.



*Filing of*
*Steele Chaffee*

90.     LCCA and Facility took direct, overt, and specific actions to further the interest of the joint enterprise.

91.     These actions were taken through a joint venture/enterprise or through LCCA and Facility's officers, directors, managers and or employees.

92.     LCCA had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

93.     Further, because LCCA and Facility were dominated by each other, these entities had an equal right to direct or control their venture, as well as to direct or control the operation and management of the Facility.

### Direct Participation/Individual Actions

94.     LCCA was always material to this lawsuit in the business of managing, owning, and operating a network of nursing homes throughout the State of Missouri. One such nursing home was the Facility where Resident was admitted for care and treatment.

95.     At all times material to this lawsuit, LCCA was fully aware that the delivery of essential care services in each of their nursing homes – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.



96.    At all times material, LCCA made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures.  More particularly, LCCA determined:

    a.   The number of staff allowed to work in their chains of nursing homes including the Facility.

    b.   The expenditures for staffing at the nursing homes including the Facility.

    c.   The revenue targets for each nursing home including the Facility.

    d.   The payor mix, and census targets for each nursing home including the Facility.

    e.   Patient recruitment programs and discharge practices at each nursing home including the Facility.

97.    All cash management functions, revenues and expenditure decisions at the nursing home level – including the Facility – were tightly managed, directed, and supervised by LCCA.

98.    It was the choices made by LCCA which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

99.    LCCA formulated, established, and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

100.    The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by LCCA was implemented and such application was carefully supervised and enforced.

101.    Following the mandates, the Facility functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as LCCA deemed appropriate.



102.    Accordingly, such manipulation by LCCA as to staffing and census were motivated by the financial needs of LCCA, and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

103.    Instead of abiding by their duty to care for the residents, LCCA chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

104.    LCCA, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

105.    At the same time, LCCA chose to design, create, implement, and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

106.    In so doing, LCCA disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Facility, by the State of Missouri, and the federal government.

### Corporate Malfeasance

107.    LCCA consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.



108.    Accordingly, LCCA, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

109.    These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Missouri and federal government imposed upon LCCA and the Facility.

110.    Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death.  This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

111.    During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, because of the acts, omissions, decisions, and choices made by LCCA in operating the Facility.

112.    During Resident's residency at the Facility, LCCA negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, as a result of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died because of this failure.

113.    LCCA manage, operate, and direct the day-to-day operations of the Facility and LCCA are liable for this direct involvement in the operations of such Facility. LCCA are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

 *Filing of*
*Steele Chaffee*

114.    The Facility and LCCA have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

a.   Chosen to disregard the duties and responsibilities which the Facility, as a licensed nursing home, owed to the State of Missouri and its residents.

b.   Created the dangerous conditions described by interfering with and causing the Facility to violate Missouri statutes, laws and minimum regulations governing the operation of said nursing home.

c.   Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management, and day to day operation of the Facility.

d.   Caused the harm complained of herein; and

e.   Choosing to disregard the contractual obligations owed to the State of Missouri and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

## COUNT I - (Wrongful Death v. All Defendants)

115.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

116.    This Count accrued after the August 28, 2015, effective date of the amendments to RSMo. § 538.210.1.  *See Coover v. Moore*, 31 Mo. 574, 576 (Mo. 1862); *Cummins v. Kansas City Pub. Serv. Co.*, 66 S.W.2d 920, 929 (Mo. banc 1933); *Nelms v. Bright*, 299 S.W.2d 483, 487 (Mo. banc 1957); *Boland v. St. Luke's Health System, Inc.*, 471 SW 3d 703 (Mo. 2015) (banc).

117.    At all times material hereto Resident was in a defenseless and dependent condition.

118.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.



Filing of
Steele Chaffee

119.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

120.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

121.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

122.    These duties required Defendants to have sufficient and qualified staff at the Facility nursing home to ensure the proper care for, and treatment of all residents including Resident.

123.    These duties required Defendants to ensure that the Facility' nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

124.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.



125.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

a.   Failing to assess Resident's pressure injury risk upon admission to the Facility.

b.   Failing to monitor Resident to prevent them from developing avoidable pressure injuries.

c.   Failing to implement the appropriate pressure injury risk precautions to prevent them from developing avoidable pressure injuries.

d.   Failing to ensure Resident was free from neglect.

e.   Failing to ensure the Facility had the adequate staffing, equipment, and other medical resources necessary to meet patients like Resident's needs with respect to prevent them from developing avoidable pressure injuries.

f.   Failing to implement the appropriate policies and procedures at the Facility for evaluating and assessing the risk of pressure injuries g in patients like Resident.

g.   Failing to implement the appropriate policies and procedures at the Facility for monitoring patients at risk of pressure injuries like Resident.

h.   Failing to implement the appropriate policies and procedures at the Facility to ensure the appropriate pressure injury risk precautions were in place for patients like Resident.

i.   Failing to implement the appropriate policies and procedures at the Facility to ensure the Facility had the adequate staffing, equipment, and other medical resources necessary to meet patients like Resident's needs with respect to preventing pressure injuries.

j.   Failing to adequately train or educate the Facility staff about safely transferring patients like Resident, including the use of appropriate equipment and other medical resources necessary to meet patients like Resident's needs with respect to preventing pressure injuries.



     k.   Failing to oversee and monitor the Facility staff to ensure Resident was safely transferred and to ensure the appropriate equipment and other medical resources necessary to meet patients like Resident's needs with respect to preventing pressure injuries were being used; and

     l.   Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

126.    Defendants, as the owners, operators, and/or managers of skilled care nursing facilities licensed by the State of Missouri and accepting Medicare and Medicaid funds, were subject to regulations promulgated by the Missouri Division of Social Services and under the Social Security Act.

127.    While providing care and treatment to Resident, Defendants and their agents, servants and/or employees breached their duty to Resident and were guilty of acts of negligence and negligence, *per se*, in violating regulations governing residential care facilities including but not limited to the following:

     a.   19 C.S.R. 30-85.042(3). The operator shall be responsible to assure compliance with all applicable laws and rules.  The administrator shall be fully authorized and empowered to make decisions regarding the operation of the Facility and shall be held responsible for the actions of all employees. The administrator's responsibilities shall include the oversight of residents to assure that they receive appropriate nursing and medical care.

     b.   19 C.S.R. 30-85.042(6).  the Facility shall not knowingly admit or continue to care for residents whose needs cannot be met by the Facility directly or in cooperation with outside resources. Facilities which retain residents needing skilled nursing care shall provide licensed nurses for these procedures.

     c.   19 C.S.R. 30-85.042(13).  the Facility shall develop policies and procedures applicable to its operation to ensure the residents' health and safety and to meet the residents' needs.  At a minimum there shall be policies covering personnel practices, admission, discharge, payment, medical emergency treatment procedures, nursing practices, pharmaceutical services, social services, activities, dietary, housekeeping, infection control, disaster and accident prevention, residents' rights, and handling residents' property.



*Filing of*
*Steele Chaffee*

d.  19 C.S.R. 30-85.042(15).  All personnel shall be fully informed of the policies of the Facility and of their duties.

e.  19 C.S.R. 30-85-14.042(16). All persons who have any contact with the residents in the Facility shall not knowingly act or omit any duty in a manner which would materially and adversely affect the health, safety, welfare, or property of a resident.

f.  19 C.S.R. 30-85.042(22).  the Facility must ensure there is a system of in-service training for nursing personnel which identifies training needs related to problems, needs, care of resident's dehydration, total kidney failure, and infection control and is sufficient to ensure staff's continuing competency.

g.  19 C.S.R. 30-85.042(37).  All facilities shall employ nursing personnel in sufficient numbers and with sufficient qualifications to provide nursing and related services which enable each resident to attain or maintain the highest practicable level of physical, mental, and psychosocial well-being.  Each facility shall have a licensed nurse in charge who is responsible for evaluating the needs of the residents on a daily and continuous basis to ensure there are sufficient trained staff present to meet those needs.

h.  19 C.S.R. 30-85.14.042(66). Each resident shall receive twenty-four (24)-hour protective oversight and supervision.

i.  19 C.S.R. 15-14.042(67).  Each resident shall receive personal attention and nursing care in accordance with his/her condition and consistent with current acceptable nursing practice.

j.  19 C.S.R. 30-85.042(79). In the event of accident, injury or significant change in the resident's condition, facility staff shall notify the resident's physician in accordance with the Facility's emergency treatment policies which have been approved by the supervising physician.

k.  19 C.S.R. 30-85.042(80). In the event of accident, injury or significant change in the resident's conditions, facility staff shall immediately notify the person designated in the resident's record as the designee or responsible party; and

l.  19 C.S.R. 30-85.042(81). Staff shall inform the administrator of accidents, injuries or unusual occurrences which adversely affect, or could adversely affect the resident. the Facility shall develop and implement responsive plans of action.

128.    Resident was a member of the class of persons intended to be protected by the enactment of the regulations.

129.    The physical injuries Resident incurred were the type of injuries that the regulations were enacted to prevent.



*Filing of*
*Steele Chaffee*

130.    As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

131.    As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiff, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish.

132.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of Resident.

133.    At the time defendants caused and allowed Resident to develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.



134. Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants aggravating circumstances damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

135. As a direct and proximate result of defendant's acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages

WHEREFORE, Plaintiff, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and aggravating circumstances damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT II - (Alter Ego v. Defendant LCCA)

136. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

137. For the purposes of this Count Defendants LCCA hereinafter referred to as the "Alter Ego Defendant".

138. Facility ("Subsidiary") is so dominated by the Alter Ego Defendant that the Subsidiary is a mere instrument of the Alter Ego Defendant and are indistinct from the Alter Ego Defendant.



*Filing of Steele Chaffee*

139.    In fact, the Subsidiary is controlled and influenced by the Alter Ego Defendant in that the Alter Ego Defendant exercised complete control and domination over the Subsidiary finances and business practices.

140.    Specifically, the Alter Ego Defendant's complete control and domination over the Subsidiary caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

141.    Upon information and belief, the Alter Ego Defendant's complete control and domination over the Subsidiary caused the Subsidiary to operate at a loss during the years of 2019, 2020, and 2021.

142.    Upon information and belief, the Alter Ego Defendant's complete control and domination over the Subsidiary caused the Subsidiary's liabilities to exceed its assets by during the years 2018-2020.  Specifically:

a.    The Alter Ego Defendant own all or most of the capital stock of the Subsidiary.

b.    The Alter Ego Defendant and the Subsidiary have common directors or officers.

c.    The Alter Ego Defendant finance the Subsidiary.

d.    The Alter Ego Defendant subscribe to all the capital stock of the Subsidiary.

e.    The Alter Ego Defendant caused the incorporation of the Subsidiary.

f.    The Facility has grossly inadequate capital.

g.    The Alter Ego Defendant pay the salaries and other expenses or losses of the Subsidiary.

h.    The Alter Ego Defendant use the property of the Subsidiary as its own; and

i.    The directors or executives of the Subsidiary do not act independently in the interest of the Subsidiary but take their orders from the Alter Ego Defendant in the latter's interest.



*Filing of*
*Steele Chaffee*

143.    Thus, the Alter Ego Defendant used the corporate cloak of the Subsidiary as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that the Alter Ego Defendant's complete control and domination of the Subsidiary depleted all the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

144.    This undercapitalization and understaffing violated Facility's duties under 19 C.S.R. § 30-85.042 and the applicable standard of care owed by a nursing home operator or manager to the Facility's residents.

145.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary – and the Alter Ego Defendant – Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life, death, and other damages.

146.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary, – and the Alter Ego Defendant – Plaintiff, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish.

147.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of Resident.

 *Filing of*
*Steele Chaffee*

148.    At the time defendants caused and allowed Resident to develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

149.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants aggravating circumstances damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

150.    As a direct and proximate result of defendant's acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages

WHEREFORE, Plaintiff, prays for judgment against the Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and aggravating circumstances damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT III - (Agency Liability v. Defendant LCCA)

151.    Plaintiff incorporates by reference all the foregoing allegations in this Petition as though fully set forth herein.



Filing of
Steele Chaffee

152.    For the Purposes of this Count, Defendant LCCA hereinafter referred to as the "Agency Defendant."

153.    The Facility held the power to alter the legal relations between the Agency Defendant and third parties.

154.    The Facility is a fiduciary with respect to the matters within the scope of the agency – in this case the operation of the nursing home.

155.    The Agency Defendant had the right to control the conduct of the Facility with respect to matters entrusted to the Facility.

156.    Specifically, the Agency Defendant possessed the right to ensure that the Facility, had appropriate policies and procedures for its nursing staff; was properly capitalized, funded, staffed; and that staff received adequate training and supervision while Resident was at the Facility.

157.    Consequently, the Agency Defendant along with the Facility owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

158.    The Agency Defendant are liable because the Facility breached its duties by failing to ensure the Facility had appropriate policies and procedures for its nursing staff; was properly capitalized, funded, staffed; and that staff received adequate training and supervision while Resident was a resident at the Facility.



159.   As a direct and proximate result of the individual and collective acts of negligence of the Agency Defendant – Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

160.   As a direct and proximate result of the individual and collective acts of negligence of the Agency Defendant, Plaintiff, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish.

161.   The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of Resident.

162.   At the time defendants caused and allowed Resident to develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.



163.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants aggravating circumstances damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

164.    As a direct and proximate result of defendant's acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages

WHEREFORE, Plaintiff, prays for judgment against the Agency Defendant in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and aggravating circumstances damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT IV - (Corporate Negligence v. Facility and LCCA)

165.    Plaintiff incorporates by reference all the foregoing allegations in this Petition as though fully set forth herein.

166.    For the purposes of this Count, Facility and LCCA hereinafter referred to as the "Corporate Defendants."

167.    Plaintiff pursues this claim for Corporate Negligence pursuant to *LeBlanc v. Research Belton Hosp.*, 278 S.W. 3d 201 (Mo. App. W.D 2008).



168.    At all relevant times, The Corporate Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

169.    These duties required The Corporate Defendants to ensure that the Facility had sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

170.    These duties also required The Corporate Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

171.    As described above, The Corporate Defendants, failed to ensure the Facility had enough staff and capital during the year of this incident as described above and the two years before the incident described above.

172.    As a direct and proximate result of The Corporate Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at the Facility, Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.



173.    As a direct and proximate result of The Corporate Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at the Facility, Plaintiff, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish.

174.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of Resident.

175.    At the time defendants caused and allowed Resident to develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

176.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants aggravating circumstances damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

177.    As a direct and proximate result of defendant's acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages

WHEREFORE, Plaintiff, prays for judgment against The Corporate Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and aggravating circumstances damages, the costs of this action, and for such other and further relief as the Court deems just and proper under the circumstances.

<u>**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**</u>

Respectfully Submitted,

STEELE CHAFFEE, LLC

By:    */s/ Jonathan Steele*
Jonathan Steele MO #63266
Kevin Chaffee    MO #63462
2345 Grand Boulevard, Suite 750
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com
kevin@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFF


SC  *Filing of*
*Steele Chaffee*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on February 15, 2022 a copy of the above and foregoing was forwarded for service to a Court appointed process server.

*/s/ Jonathan Steele*
Attorney for Plaintiff

